13-384-cv
*Security Plans v. CUNA Mutual*

1    UNITED STATES COURT OF APPEALS
2    FOR THE SECOND CIRCUIT

3    August Term, 2013

4    (Argued: Nov. 7, 2013    Decided: October 17, 2014)

5    Docket No. 13-384

6    ▬▬▬▬▬▬▬▬▬▬▬▬

7    Security Plans, Inc., f/k/a Creditor Services, Inc.,
8    *Plaintiff–Appellant,*

9    v.

10    CUNA Mutual Insurance Society,
11    *Defendant–Appellee.*

12    ▬▬▬▬▬▬▬▬▬▬▬▬

13   Before:    SACK, HALL, and LIVINGSTON, *Circuit Judges.*

14         Appeal from a judgment of the United States District Court for the

15   Western District of New York (David G. Larimer, *Judge*), granting

16   summary judgment to the defendant as to the plaintiff's claims alleging

17   breach of contract and violation of the implied covenant of good faith and

18   fair dealing.  The district court, in granting summary judgment as to the

19   breach of contract claim, properly refused to admit parol evidence to alter

20   the meaning of an unambiguous contractual provision.  But we conclude

21   that the district court erred in granting summary judgment to the

22   defendant on the implied covenant claim without determining whether, in

1

1  calculating payments owed to the plaintiff, the defendant exercised its

2  discretion arbitrarily or irrationally.  Because we conclude that the record

3  at the summary judgment stage presents a material dispute on this

4  question, the judgment of the district court is

5          AFFIRMED in part, VACATED in part, and REMANDED.

6                                    JERAULD E. BRYDGES (Fred G.
7                                    Aten Jr., *on the brief*), Harter, Secrest
8                                    & Emery LLP, Rochester, New York,
9                                    *for Plaintiff–Appellant.*
10                                   DREW J. COCHRANE (Jon Evenson,
11                                   *on the brief*), Stafford Rosenbaum
12                                   LLP, Madison, Wisconsin, and
13                                   Jeffrey Harradine, Ward Greenberg
14                                   Heller & Reidy LLP, Rochester, New
15                                   York, *for Defendant–Appellee.*

16  SACK, *Circuit Judge*:

17          This appeal from a judgment of the United States District Court for

18  the Western District of New York (David G. Larimer, *Judge*) concerns the

19  scope and effect of the implied covenant of good faith and fair dealing

20  that, as a matter of law, accompanies contracts concluded under New York

21  law.  Security Plans, a credit insurer, sold its business to CUNA Mutual in

22  exchange for an upfront sum and a performance-based payment, which

23  would be calculated using three years of returns on Security Plans' former

2

1    business.  After the requisite time period, CUNA Mutual determined that

2    Security Plans was not entitled to any performance-based payment.

3    Security Plans argues that CUNA Mutual committed a company-wide

4    error in managing its insurance policies, which substantially reduced the

5    payment calculation.  CUNA Mutual's failure to control for this error,

6    Security Plans argues, constituted an arbitrary and irrational exercise of

7    contractually conferred discretion, violating the implied covenant of good

8    faith and fair dealing.

9         Under New York law, all contracts that confer discretion include an

10    implied promise that neither party will "act arbitrarily or irrationally" in

11    exercising that discretion.  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389,

12    663 N.E.2d 289, 291 (1995).  The district court acknowledged this principle.

13    But the court rejected the plaintiff's implied covenant claim, concluding

14    that the record at the summary judgment stage reflected no evidence that

15    CUNA Mutual acted in bad faith or with wrongful intent.  We conclude

16    that, on the facts of this case, a question of fact remains as to whether the

17    defendant acted arbitrarily in calculating the earnout amount.  We

18    therefore vacate the portion of the district court's decision concerning the

3

1  implied covenant and remand for further proceedings.  For the reasons set

2  forth below, we affirm the portion of the district court's judgment that

3  granted summary judgment to the defendant on a separate breach of

4  contract claim.

5                           **BACKGROUND**

6          Security Plans, Inc., formerly known as Creditor Services, Inc., is a

7  corporation based in Mendon, New York, which until 2002 specialized in

8  the sale of credit-related insurance products, primarily to credit unions.

9  Security Plans' primary products were credit life and credit disability

10  insurance, which promise to pay the outstanding balance on a loan in the

11  event the borrower dies or becomes disabled.  In 2002, Security Plans

12  agreed to sell substantially all of its assets to CUNA Mutual Insurance

13  Society, a company incorporated in Iowa, with its principal office in

14  Madison, Wisconsin.  The parties set in motion a plan to transfer Security

15  Plans' insurance clients (its "book of business") to CUNA Mutual.  The

16  merger was completed on January 2, 2003.

17          *The Merger Agreement and Earnout Formula*

18          An Asset Purchase Agreement, dated May 31, 2002, set forth the

19  terms of this merger.  CUNA Mutual agreed to pay $3 million immediately

4

1    plus an additional performance-based payment to be made three years

2    after the merger was concluded for Security Plans' property and book of

3    business.  The deferred-payment component of this compensation package

4    is commonly referred to as an "earnout."[1]  Under this contract, the

5    maximum possible earnout was $2.2 million.

6         CUNA Mutual also executed three-year employment agreements

7    with each of the three Security Plans shareholders, in which the

8    shareholders agreed to assist in transitioning the book of business.  Each

9    former Security Plans client would have to decide individually whether to

10   accept CUNA Mutual as its new insurer, and the earnout was therefore

11   designed to encourage the shareholders to convert as many clients as

12   possible.

---

[1] An earnout permits parties to conclude a merger without first agreeing as to the proper valuation of the target company:

> From the point of view of the buyer and seller, the goal of the earnout is to overcome significant valuation differences that may come between the parties during negotiations and prevent them from reaching agreement.  Through a contingent payment structure, the parties agree to disagree and defer the ultimate valuation question until a later point in time when the uncertainties with respect to valuation have been resolved.

Brian J.M. Quinn, *Putting Your Money Where Your Mouth Is: The Performance of Earnouts in Corporate Acquisitions*, 81 U. Cin. L. Rev. 127, 133 (2012).

1      The basic formula for calculating the earnout is not in dispute.  The

2   performance of Security Plans' book of business would be calculated

3   annually for three years after closing, and then another three years of

4   performance would be projected based on the data from the third year.

5   Two variables would largely determine the size of the earnout: a weighted

6   average of total written premiums brought in by the acquired business,

7   and a weighted average of the business's combined loss ratios.[2]  These two

8   amounts would be used to calculate a preliminary total earnout, which

9   would then be reduced by service fees and other reimbursements paid to

10   credit unions.  This reduced figure would represent the final payment.

11      The Asset Purchase Agreement also provided:

12      [Security Plans] acknowledges that [CUNA Mutual] is under
13      no obligation to operate its business after Closing in a manner
14      focused on maximizing the Earn-Out . . . and may operate the
15      business in accordance with its best business judgment.

16   Asset Purchase Agreement ¶ 2.9(e).

17      This dispute concerns two factors that affected the calculation of the

18   earnout.  First, Security Plans contends, CUNA Mutual used incorrect

---

[2] A "loss ratio" is the total incurred claims on the written insurance policy
divided by the earned premium; it may be affected by a number of variables,
including claim reserves.

1    figures to calculate loss ratios for these accounts, thereby leading to a

2    lower earnout than that to which Security Plans was entitled.  Second,

3    Security Plans argues, CUNA Mutual imposed an excessive deduction

4    relating to service fees paid to credit unions.

5    ***Loss Ratios and the Claim Reserves Issue***

6            Insurers are required by accounting rules and by statute to carry

7    claim reserves, which are kept in anticipation of future liabilities.  Claim

8    reserves are, for accounting purposes, considered to be a component of

9    incurred claims.  Increases in incurred claims ordinarily will, all other

10   things being equal, increase a company's loss ratio.  Higher loss ratios

11   would reduce Security Plans' earnout.

12           The parties agree that the loss ratios recorded for Security Plans'

13   book of business for 2003 through 2005—the relevant reporting period for

14   the earnout—were "atypically high."  Def.'s Statement of Facts Pursuant to

15   Local R. 56.1, ¶ 30; *accord* Pl.'s Resp. Pursuant to Loc. R. 56.1(B), ¶ 30.  Their

16   unusually high loss ratios were largely attributable to the fact that, during

17   the same period, CUNA Mutual was carrying abnormally high claim

18   reserves on all of its business, including the Security Plans policies.

7

1    CUNA Mutual began to release claim reserves in 2006 to compensate for

2    the problem, but it did not correct the reserves concerning Security Plans'

3    book of business in time to affect the earnout.

4        The reason for the magnitude of the claim reserves is not entirely

5    clear.  CUNA Mutual has asserted that, although the reserve levels were

6    later revised downward, their size during the 2003 to 2005 time period

7    resulted from "the exercise of business judgment by CUNA Mutual's

8    actuaries."  Def.'s Statement of Facts Pursuant to Loc. R. 56.1, ¶ 31.  The

9    plaintiff disputes that, characterizing the reserve levels as a systemic,

10   company-wide error, which CUNA Mutual sought to correct in 2006 by

11   releasing what ultimately amounted to millions of dollars in excess

12   reserves.  In other words, the plaintiff suggests that rather than

13   deliberately keeping high claim reserves as a strategic or actuarial decision,

14   CUNA Mutual failed to correct aberrations that distorted the performance

15   data until 2006.

16       The record contains some evidence supporting the plaintiff's

17   position.  Rich Fischer, a CUNA Mutual manager who dealt frequently

18   with the Security Plans merger, testified that he could not explain the high

1    loss ratios associated with the book of business, and agreed that he was

2    unsure that the earnout calculation was accurate in light of the

3    unexpectedly high loss ratios.  Dep. Rich Fischer, June 8, 2010, at 139–41.

4    In an internal e-mail, Fischer described the claim reserve levels as "suspect

5    numbers."  E-mail from Rich A. Fischer to Gary E. Young (Feb. 22, 2007,

6    6:19 AM).  In another e-mail, Fischer noted that "[t]he reserve looks too

7    high for these accounts."  E-mail from Rich A. Fischer to Barry J. Owens et

8    al. (Sept. 15, 2006, 3:43 PM).  Barry Owens, another CUNA Mutual

9    manager who worked on the issue, agreed that the claim reserves were too

10   high.  In an internal e-mail, he appeared to stress the need to correct the

11   claim reserves calculation, telling Fischer, "you could either correct this,"

12   meaning, adjust the numbers in the earnout calculation, "or not use me" in

13   discussions with the Security Plans principals.  E-mail from Barry J. Owens

14   to Rich A. Fischer et al. (July 7, 2006, 1:44 PM).  "If you ask me to help,"

15   Owens wrote, "I am going to be forthcoming."  *Id.*

1    In light of the claim reserves problem, both parties initially set about

2    discussing ways to adjust the earnout calculation.[3]  At the time, it appeared

3    clear to all concerned that Security Plans' book of business was actually

4    performing better than the uncorrected loss ratios would indicate.  *See, e.g.*,

5    E-mail from Rich A. Fischer to Barry J. Owens et al. (Sept. 15, 2006, 3:43

6    PM) ("Our desire to release the reserve slowly should not impact the fact

7    that the results of [the Security Plans accounting] really are better early

8    than we are showing[.]").  Accordingly, Fischer suggested that CUNA

9    Mutual recalculate the Security Plans loss ratio to take the abnormally high

10   claim reserves into account.  He was skeptical that the corrections would

11   result in a positive earnout, but he told a colleague that the revised

12   calculations "will give me comfort that I have reviewed this with an open

13   eye—I would assume if you were John [O'Kipney, a founder of Security

14   Plans,] you would expect the same." *Id.*

---

[3] One method of addressing the problem, never adopted, entailed delaying the
earnout calculation until 2009, so that it could be based on six years of actual
performance data, rather than three years of historical data and three years of
projections.  This approach would have required amending or deviating from the
Asset Purchase Agreement.  CUNA Mutual declined to do so.

1    The plaintiff contends that CUNA Mutual never conducted these

2    revisions.  Fischer later testified that he did perform revised calculations,

3    but that they did not result in a positive earnout because other deductions

4    made pursuant to the Asset Purchase Agreement reduced the earnout

5    below zero, even using the more favorable loss ratios.  CUNA Mutual has

6    not, however, provided a revised calculation that would support this

7    conclusion.

8    *Service Fees*

9    A credit insurer may pay an administrative service fee to a credit

10    union if the union enrolls insured debtors, processes claims, and performs

11    other services on behalf of the insurer.  *See* N.Y. Comp. Codes R. & Regs.

12    tit. 11, § 185.9.  State regulations set an upper limit for these service fees,

13    which, barring some exceptions not relevant to this appeal, is expressed as

14    a maximum dollar amount per $1,000 of insured indebtedness.  *See id.* §

15    185.9(f).  Therefore, so long as the amount of insured indebtedness stayed

16    constant, the maximum dollar amount of allowable fees would remain the

17    same regardless of any change in the premiums charged on an insurance

18    policy.

1      For the purposes of calculating Security Plans' earnout, the Asset

2  Purchase Agreement also imposed an upper limit on service fees paid to

3  credit unions pursuant to any of the Security Plans policies.  This limit did

4  not, strictly speaking, prevent the payment of service fees at any amount

5  permitted by law.  It did, however, provide that any fees paid above the

6  contractual limitation would be deducted from Security Plans' earnout,

7  whereas fees paid below that limit would not be deducted.  This cap,

8  unlike the limit imposed by law, was expressed as a percentage of the

9  written premium assessed on any credit life or credit disability insurance

10  policy.  Thus, under the framework imposed by the contract, any increase

11  or decrease in the premium charged on an insurance policy would entail a

12  corresponding change in the maximum dollar amount of allowable service

13  fees on that policy.

14      The upshot of all this was that service fees pegged to the maximum

15  allowable fee under state law might exceed the caps set by the contract,

16  especially if insured indebtedness is relatively high and premiums are low.

17  If this happened, the fees paid in excess of the contractual cap would be

18  deducted from Security Plans' earnout.

1       At the time of the merger, Security Plans' underwriter was paying

2   the maximum service fee allowable under New York law, while CUNA

3   Mutual was not.  In a letter dated March 13, 2002, John O'Kipney, one of

4   the Security Plans founders, requested that CUNA Mutual confirm its

5   willingness to continue paying credit unions the maximum service fee

6   once the Security Plans polices were transferred.  In the discussion of

7   service fees, O'Kipney did not mention the earnout payment or the

8   percentage caps in the earnout calculation.  O'Kipney's letter also

9   addressed a variety of other items not relevant to the present dispute.

10  O'Kipney stated that "[i]n all likelihood, we'll want to incorporate the

11  company's response to many of these items into the Definitive

12  Agreement."  Letter of John O'Kipney to Gary E. Young (Mar. 13, 2002).

13      Margaret Immerfall, a CUNA Mutual vice president, responded that

14  the company did not wish to revise the Asset Purchase Agreement at that

15  late stage of negotiations.  O'Kipney Decl. ¶ 33.  O'Kipney recalls,

16  however, that he and Immerfall agreed to address the issue in a "letter of

17  understanding."  *Id.*  Then, on April 10, 2002, Immerfall  replied by letter to

18  O'Kipney's correspondence of March 13, confirming CUNA Mutual's

1 "willingness to pay identical service fees to those currently being paid" to

2 Security Plans' clients. Letter of Margaret Immerfall to John O'Kipney

3 (Mar. 13, 2002). That letter stated only that CUNA Mutual would continue

4 paying the fees. It did not mention that, under the terms of the Asset

5 Purchase Agreement, any fees charged in excess of the contractual cap

6 would be deducted from the earnout calculation.

7     When the Asset Purchase Agreement was finalized at the end of

8 May 2002, the earnout provision remained unchanged – it continued to

9 impose a cap on service fees for purposes of calculating the earnout

10 payment and did not acknowledge that the letter of April 10, 2002, would

11 allow service fees to be charged above this cap. O'Kipney has stated that

12 he nonetheless understood the letter of April 10, 2002, to "supersede" the

13 relevant provisions of the Asset Purchase Agreement, such that fees

14 charged above the cap pursuant to the letter would not be deducted from

15 the earnout. O'Kipney Decl. ¶ 36.

16     The following July, CUNA Mutual wrote to the New York State

17 Chief Insurance Policy Examiner requesting permission to take over

18 Security Plans' business. It said that service fees would remain the same.

14

1    At this point, service fees on the majority of Security Plans' programs

2    exceeded the caps set in the Asset Purchase Agreement.  Throughout the

3    time period relevant to the earnout, CUNA Mutual continued to pay

4    service fees at the same level that Security Plans had been paying prior to

5    the merger.

6         *Final Earnout Calculation*

7         CUNA Mutual finalized its accounting of the earnout on August 8,

8    2006.  It determined that Security Plans' book of business carried a six-year

9    average written premium of $7.1 million and an average loss ratio of 70.2

10   percent, which would entitle Security Plans to an earnout of $301,000.

11   That amount was then reduced nearly to zero, though, by $291,752 in

12   excess service fees paid to credit unions.  Any remaining payment was

13   wiped out by an additional $1.5 million deduction for so-called

14   "experience refunds."[4]  The resulting earnout was nil.

15        *This Litigation*

16        On July 14, 2008, the plaintiff filed a complaint commencing this

17   lawsuit in the United States District Court for the Western District of New

---

[4] The plaintiff contested the legal basis for the experience refund deductions in the district court, but that argument is not a subject of this appeal.

1    York invoking the court's diversity jurisdiction under 28 U.S.C. § 1332(a),

2    and alleging breaches of contract and of the implied covenant of good faith

3    and fair dealing.  The complaint did not specify the amount of damages it

4    was seeking, although it alleged that a fairly and accurately calculated

5    earnout would have exceeded $75,000.[5]

6            Arguments in the district court focused on three principal claims.

7    First, the plaintiff asserted that CUNA Mutual's handling of the claim

8    reserves issue constituted a breach of the implied covenant of good faith

9    and fair dealing, and led to a lower earnout calculation than was

10   appropriate.  Second, the plaintiff argued that CUNA Mutual's decision to

11   deduct $291,752 in excess service fees violated an understanding, reflected

12   in the letter of April 10, 2002, that no such deductions would be made.

13   Third, the plaintiff maintained that the deduction of certain so-called

---

[5]  This is sufficient to establish subject-matter jurisdiction:

> A party invoking the jurisdiction of the federal court has the burden
> of proving that it appears to a reasonable probability that the claim
> is in excess of the statutory jurisdictional amount.  This burden is
> hardly onerous, however, for we recognize a rebuttable
> presumption that the face of the complaint is a good faith
> representation of the actual amount in controversy.

*Scherer v. Equitable Life Assurance Soc'y of the U.S.*, 347 F.3d 394, 397 (2d Cir. 2003)
(citations and internal quotation marks omitted).

16

1    experience refunds from the earnout was impermissible under the Asset

2    Purchase Agreement because those refunds were paid too late to make

3    them deductible under the formula prescribed by the contract.  On March

4    29, 2010, Security Plans moved for partial summary judgment on the

5    experience refunds issue.  On July 1, 2010, CUNA Mutual moved for

6    summary judgment dismissing the complaint in its entirety.

7         In an order filed November 16, 2012, the district court granted

8    CUNA Mutual's motion for summary judgment as it pertained to the claim

9    reserves and the service fee issues, but found a triable issue of fact

10    concerning the experience refund claim.[6]  Order at 1–19, *Security Plans, Inc.*

11    *v. CUNA Mut. Ins. Soc'y*, No. 08-cv-6313 (W.D.N.Y. Nov. 16, 2012)

12    ("Order").  Subsequently, the plaintiff's counsel moved that the case be

13    dismissed in its entirety, explaining that even if Security Plans were to

14    prevail on the experience refund claim, this would not be sufficient to

15    achieve a positive earnout balance in light of the district court's grant of

16    summary judgment on the remaining arguments.  The district court, by

---

[6] CUNA Mutual had also moved to strike portions of the record.  The district court denied these motions to strike as moot, because the evidence that CUNA Mutual sought to strike related exclusively to claim reserves.

17

1    order dated January 18, 2013, granted this motion.  Order at 1, *Security*

2    *Plans, Inc. v. CUNA Mut. Ins. Soc'y*, No. 08-cv-6313 (W.D.N.Y. Jan. 18,

3    2013).  Final judgment was entered four days later.

4        The plaintiff appeals, challenging the district court's judgment based

5    on the loss ratio and service fee issues.

6                                    **DISCUSSION**

7        "We review a district court's decision to grant summary judgment *de*

8    *novo*, construing the evidence in the light most favorable to the party

9    against which summary judgment was granted and drawing all reasonable

10   inferences in its favor." *Wachovia Bank, N.A. v. VCG Special Opportunities*

11   *Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011), *cert. denied*, 132 S. Ct.

12   2439 (2012).  We also review *de novo* "questions as to the plain meaning or

13   ambiguity of the language of a contract." *Fabozzi v. Lexington Ins. Co.*, 601

14   F.3d 88, 90 (2d Cir. 2010).   We will affirm a grant of summary judgment

15   only if there is no genuine issue of material fact and the prevailing party

16   was entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(a).

17   **I.    Breach of Contract Claim: Determination of Service Fees**

18       The parties do not dispute that, under the terms of the Asset

19   Purchase Agreement finalized on May 31, 2002, CUNA Mutual was

1    entitled to deduct $291,752 in excess service fees from the earnout payment

2    to Security Plans.  Security Plans argues, however, that CUNA Mutual's

3    letter of April 10, 2002, in which CUNA Mutual expressed its willingness

4    to continue paying service fees that were higher than the caps imposed by

5    the Asset Purchase Agreement, constituted an implicit promise that excess

6    fees would not be deducted from the earnout payment.  This letter was

7    sent by CUNA Mutual and received by the plaintiff more than a month

8    before the agreement was finalized.  The plaintiff nonetheless argues that

9    CUNA Mutual was bound by the terms of this letter to refrain from

10    deducting service fees when calculating the earnout.

11         The district court correctly observed that such a result would

12    "plainly run[ ] afoul of the parol evidence rule."  Order at 17.  In New York,

13    "[i]t is well settled that extrinsic and parol evidence is not admissible to

14    create an ambiguity in a written agreement which is complete and clear

15    and unambiguous upon its face."  *W.W.W. Assocs., Inc. v. Giancontieri*, 77

16    N.Y.2d 157, 163, 566 N.E.2d 639, 642 (1990) (citations and internal

17    quotation marks omitted); *accord U.S. Bank Trust Nat'l Ass'n v. AMR Corp.*

18    (*In re AMR Corp.*), 730 F.3d 88, 98 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1888

1    (2014).  "Evidence outside the four corners of the document as to what was

2    really intended but unstated or misstated is generally inadmissible to add

3    to or vary the writing."  *W.W.W. Assocs.*, 77 N.Y.2d at 162, 566 N.E.2d at

4    642.  Parol evidence "is admissible only if a court finds an ambiguity in the

5    contract."  *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436, 986 N.E.2d

6    430, 433 (2013).

7         The letter of April 10, 2002, upon which the plaintiff relies, falls

8    beyond the borders of the parties' written agreement, and therefore

9    constitutes parol evidence.  The Asset Purchase Agreement contains a

10   merger clause, which states that the contract is an integrated document

11   reflecting a complete statement of the bargain between the parties.  Asset

12   Purchase Agreement ¶ 13.7.  The merger clause does not incorporate by

13   reference the letter of April 10, 2002.  *See id.* (incorporating specified

14   documents, including exhibits, but not the April letter).  We deem the

15   parties, by defining the scope of their agreement in a merger clause, to

16   have intended "to require the full application of the parol evidence rule in

17   order to bar the introduction of extrinsic evidence to alter, vary or

1    contradict the terms of the writing." *Jarecki v. Shung Moo Louie*, 95 N.Y.2d

2    665, 669, 745 N.E.2d 1006, 1009 (2001).

3        We might consider extrinsic evidence to illuminate an ambiguous

4    contractual term.  *See, e.g., Schron*, 20 N.Y.3d at 436, 986 N.E.2d at 433.  But

5    we find no such ambiguity here.[7]  The Asset Purchase Agreement provides

6    specific limits for service fees paid to credit unions and states that, if fees

7    are paid in excess of those limits, the overage will be deducted from the

8    earnout.  Asset Purchase Agreement ¶ 2.9(b)(iii).  The plaintiff has not

9    called into question the clarity of this provision.  The contract is therefore

10   unambiguous with respect to the deduction of excess service fees.  We

11   conclude that the district court properly declined to rely on parol evidence

12   to reinterpret the contract.

13       We also reject the plaintiff's argument that the doctrine of

14   promissory estoppel bars CUNA Mutual from deducting excess service

15   fees.  To demonstrate promissory estoppel under New York law, a party

16   must show reasonable and detrimental reliance upon a clear and

17   unambiguous promise.  *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

---

[7] "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *W.W.W. Assocs.*, 77 N.Y.2d at 162, 566 N.E.2d at 642.

1    As a general matter, "a party may not maintain a promissory estoppel

2    claim where the promises on which the claim is based are expressly

3    contradicted by a later written agreement covering the same subject

4    matter." *Underdog Trucking, LLC v. Verizon Servs. Corp.*, No. 09-Civ.-8918,

5    2010 WL 2900048, at *6, 2010 U.S. Dist. LEXIS 72642, at *18–*19 (S.D.N.Y.

6    July 20, 2010); *see also Fariello v. Checkmate Holdings, LLC*, 82 A.D.3d 437,

7    438, 918 N.Y.S.2d 408, 409 (1st Dep't 2011) (holding that promissory

8    estoppel claim is barred by merger clause in subsequent agreement

9    between the parties); *Capricorn Invs. III, L.P. v. Coolbrands Int'l, Inc.*, 66

10    A.D.3d 409, 410, 886 N.Y.S.2d 158, 159 (1st Dep't 2009) (rejecting claim

11    where asserted promise was "flatly contradicted by the parties' written

12    agreement which covered the same subject matter and expressly

13    superseded all other prior agreements and understandings").

14        Even if the letter of April 10, 2002, did constitute a promise not to

15    deduct the service fees,[8] that promise was flatly contradicted by the final

---

[8] The so-called letter agreement only "confirm[s]" CUNA Mutual's "willingness to pay identical service fees to those currently being paid to [Security Plans] clients." Letter of Margaret Immerfall to John O'Kipney (Apr. 10, 2002). This expressed willingness to continue paying the excess service fees is not necessarily inconsistent with a requirement that such excesses later be deducted from Security Plans' earnout.

1   Asset Purchase Agreement, which was concluded more than a month later.

2   Security Plans, therefore, cannot be said to have reasonably relied upon

3   this earlier promise in light of the clear terms of its contract.  For these

4   reasons, we affirm the district court's grant of summary judgment on the

5   plaintiff's service fee claim.

6   II.    **Implied Covenant of Good Faith Claim: Determination of**
7          **Claim Reserves**

8       The plaintiff also contends that the defendant's handling of the claim

9   reserves and the resultant earnout calculation violated the implied

10  covenant of good faith and fair dealing.  New York law implies such a

11  covenant in all contracts.  *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir.

12  2011); *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153,

13  773 N.E.2d 496, 500 (2002); *see also* Restatement (2d) of Contracts § 205

14  (1981).  Pursuant to this principle, "neither party shall do anything which

15  will have the effect of destroying or injuring the right of the other party to

16  receive the fruits of the contract."  *Moran v. Erk*, 11 N.Y.3d 452, 456, 901

17  N.E.2d 187, 190 (2008) (internal quotation marks omitted).  A breach of the

18  covenant is considered a breach of the underlying contract.  *Nat'l Mkt.*

19  *Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

1    The implied covenant does not "undermine a party's 'general right to

2    act on its own interests in a way that may incidentally lessen'" the other

3    party's expected benefit. *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136

4    (2d Cir. 1990) (per curiam) (quoting *Van Valkenburgh, Nooger & Neville, Inc.*

5    *v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46, 281 N.E.2d 142, 145, *cert. denied*, 409

6    U.S. 875 (1972)).  The covenant will be breached only in a narrow range of

7    cases.  A plaintiff must show substantially more than evidence that the

8    defendant's actions were negligent or inept.  *See Behren v. Warren Gorham &*

9    *Lamont, Inc.*, 24 A.D.3d 132, 133, 808 N.Y.S.2d 157, 158 (1st Dep't 2005)

10    (noting, in affirming summary judgment, that the plaintiff had admitted

11    that the "defendant's alleged mismanagement was due to ineptitude");

12    *Wagner v. JP Morgan Chase Bank*, No. 06-Civ-3216(RJS), 2011 WL 856262, at

13    *4, 2011 U.S. Dist. LEXIS 2456, at *11–*12 (S.D.N.Y. Mar. 9, 2011) (stating

14    that the plaintiff must show something more than that the defendant was

15    "misguided or ignorant or even merely negligent" (citation omitted)); *cf.*

16    *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372–73

17    (1990) (observing that "mere negligence" is insufficient to constitute

18    arbitrary conduct that breaches union's statutory duty of fair

24

1   representation); *McClary v. Civil Serv. Emps. Ass'n, Inc.*, 133 A.D.2d 522,

2   522, 520 N.Y.S.2d 88, 89 (4th Dep't 1987) (same).  The plaintiff must instead

3   demonstrate something more, such as that the defendant "act[ed]

4   arbitrarily or irrationally in exercising [the] discretion" afforded to it under

5   the contract.  *Dalton*, 87 N.Y.2d at 389, 663 N.E.2d at 291; *see also Behren*, 24

6   A.D.3d at 133, 808 N.Y.S.2d at 158 (affirming summary judgment because

7   there was no "issue of fact as to whether defendant's alleged

8   mismanagement of those assets was arbitrary or irrational").

9          The plaintiff alleges two violations of the implied covenant of good

10  faith and fair dealing.  Only one of them, we think, has merit based on the

11  record at summary judgment.[9]  First, the plaintiff argues, the defendant

12  acted irrationally or arbitrarily in setting (or failing to correct) the excessive

13  claim reserves, thus causing the higher loss ratios and the lower earnout

14  calculation of which the plaintiff complains.  We agree with the district

---

[9] In addition to what follows, the plaintiff argues that its book of business received disparate treatment when compared with CUNA Mutual's business overall, even without taking into account the system-wide problems concerning claim reserves.  This argument would require the factfinder to engage in a chain of speculations and inferences, in which a trial judge is not required to indulge even at summary judgment.  *See, e.g., Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.").  Therefore, insofar as the plaintiff's claims turn on these factual allegations, we reject them.

1    court that this aspect of the claim cannot withstand the defendant's motion

2    for summary judgment inasmuch as the record contains nothing to suggest

3    anything more than negligence in CUNA Mutual's handling of the claim

4    reserves.  Negligence in operating a business, as we have explained, is

5    insufficient to support a claim under the implied covenant.  *See, e.g.,*

6    *Behren*, 24 A.D.3d at 133, 808 N.Y.S.2d at 158.  We therefore focus, as the

7    plaintiff does in its briefs, on its second argument: that CUNA Mutual

8    acted arbitrarily when it refused to provide a revised earnout calculation

9    in light of an alleged system-wide error concerning claim reserves.

10        The implied covenant's prohibition on arbitrary or irrational

11    exercises of discretion may apply to this second claim.   The Asset

12    Purchase Agreement expressly confers on the defendant broad discretion

13    to "operate the business in accordance with its best business judgment."

14    Asset Purchase Agreement, ¶ 2.9(e).  And the contract places on the

15    defendant the responsibility for calculating the earnout, thereby conferring

16    a limited discretion in selecting the values—such as loss ratios and written

17    premium—that enter into the calculation in the first place.  *See id.*

18    ¶ 2.9(b)(vii).  This latter form of limited discretion is indeed the subject of

1    the plaintiff's claim in this case,[10] and the plaintiff may therefore argue that

2    the defendant acted arbitrarily or irrationally in handling the earnout

3    calculation.  *See Dalton*, 87 N.Y.2d at 392, 663 N.E.2d at 293.

4         Furthermore, the provision in the Asset Purchase Agreement

5    entitling CUNA Mutual to exercise its "best business judgment" in the

6    operation of the merged business, Asset Purchase Agreement, ¶ 2.9(e),

7    does not displace *Dalton*'s requirement that discretion be exercised in a

8    non-arbitrary manner.  While New York courts generally will not disturb

9    actions taken pursuant to a party's business judgment, *see Nikitovich v.*

10   *O'Neal*, 40 A.D.3d 300, 301, 836 N.Y.S.2d 34, 35 (1st Dep't 2007) ("[T]his

11   Court may not substitute its business judgment for that of the employer.");

12   *Ins. Co. of Greater N.Y. v. Glen Haven Residential Health Care Facility*, 253

13   A.D.2d 378, 379, 676 N.Y.S.2d 176, 177 (1st Dep't 1998) (similar), the New

14   York Court of Appeals has explained in a related context that arbitrary

---

[10] This claim does not, by contrast, arise from the defendant's "interpolation" of the exhibits attached to the Asset Purchase Agreement, which are meant to guide the calculation of the earnout.  *See* Asset Purchase Agreement, ¶ 2.9(b)(vii). Because the plaintiff expressly agreed in the contract to abide by the defendant's interpolations, *see id.*, such a claim would likely be barred by that agreement.  *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002) (observing that the plaintiff "cannot avoid the express terms of the contract by relying on the implied covenant of good faith and fair dealing").

1    decision-making is incompatible with the exercise of legitimate business

2    judgment, *40 W. 67th St. v. Pullman*, 100 N.Y.2d 147, 157, 790 N.E.2d 1174,

3    1182 (2003); *see also Fletcher v. The Dakota, Inc.*, 99 A.D.3d 43, 48, 948

4    N.Y.S.2d 263, 267 (1st Dep't 2012) (explaining that arbitrariness "is not

5    protected by the business judgment rule").  Therefore, a provision entitling

6    the defendant to act in its best business judgment does not alter the scope

7    of our inquiry, which is already limited to arbitrary or irrational exercises

8    of discretion.[11]

9         The record on appeal, moreover, presents sufficient evidence to

10   create a triable issue of fact as to the defendant's handling of the earnout

11   calculation.  The parties understood that the earnout would be based on

12   the "performance" of Security Plans' former book of business.  Asset

---

[11] We need not and do not decide whether and to what extent a different contractual provision may constrict or obviate the protections of the implied covenant.  *Compare State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (finding that the covenant does not prevent a bank from arbitrarily withholding consent to particular conduct when a contract confers an absolute right to withhold consent), *cert. denied*, 543 U.S. 1177 (2005), *with Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) ("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith.").  *See also In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 466–67 (S.D.N.Y. 2013) (declining to decide whether a provision expressly waiving the implied covenant of good faith is enforceable).

Purchase Agreement, ¶ 2.9(a).  Although Security Plans' business appeared

to perform poorly during the relevant period, it was understood by CUNA

Mutual managers that a system-wide problem with excessive claim

reserves had distorted the performance data.  This realization led several

of the managers to consider the relevant loss ratio numbers with suspicion,

thinking they were too high and thus not entirely accurate.  These

managers apparently took initial steps to recalculate the earnout using

more accurate figures that would have benefited the plaintiff, but

appeared to abandon that effort before any revised calculation was

completed and supplied.

Making all inferences in the plaintiff's favor, a rational trier of fact

could properly conclude that it was arbitrary for the defendant to refuse to

revise the earnout calculation in order to correct for the suspect numbers.

On this record, a trier of fact could, but would not necessarily be required

to, conclude that: (i) the initial decision that set high claim reserves for the

earnout period was made by mistake, and not as a result of actuarial

judgment; (ii) this mistake caused Security Plans' performance data to be

distorted in ways that negatively affected the earnout; (iii) this mistake

29

1    was noticed in time to revise the earnout calculation accordingly, and such

2    revision was possible; (iv) the mistake was acknowledged by all parties

3    concerned; and (v) CUNA Mutual, for no valid business reason, decided

4    not to adjust the earnout calculation.  In making this second decision not to

5    revise the calculation, CUNA Mutual was exercising its contractually

6    conferred authority as the party charged with calculating the earnout, but

7    a trier of fact could find it exercised this discretion arbitrarily.

8        In other words, this is not a case in which the plaintiff alleges only

9    that that the defendant's mismanagement or ineptitude in running the

10   business post-merger damaged its ultimate payment.  *See, e.g.*, *Wagner*,

11   2011 WL 856262, at *4-*5, 2011 U.S. Dist. LEXIS 24518, at *11–*12 (rejecting

12   a claim on this basis under New York law); *Fireman v. News Am. Mktg. In-*

13   *Store, Inc.*, No. 05-11740, 2009 WL 3080716, at *10, 2009 U.S. Dist. LEXIS

14   91236, at *27–*29 (D. Mass. Sept. 26, 2009) (same); *Tagare v. Nynex Network*

15   *Sys. Co.*, 994 F. Supp. 149, 159–60 (S.D.N.Y. 1997) (same).  Although

16   nothing in the record indicates that the initial decision to set abnormally

17   high claim reserves was anything more serious than negligence, the

18   plaintiff also has presented evidence suggesting that CUNA's managers

30

1    recognized their error and understood that the numbers used to calculate

2    the earnout calculation were faulty insofar as they did not reflect the

3    business's performance.  Despite this awareness, CUNA Mutual declined

4    to provide the plaintiff with a revised calculation, and their reasons for

5    doing so are unclear from the record developed at the time of the motion

6    for summary judgment.  A trier of fact could conclude that the decision

7    was arbitrary.

8         On remand, the plaintiff's claim based on the implied covenant will

9    depend, in large measure, on the defendant's reasons for not revising the

10   calculation.  If CUNA Mutual can convince the trier of fact that it had a

11   genuine and colorable business justification for its decision, then its actions

12   will not have been arbitrary, and thus will not have violated the implied

13   covenant. *Cf. Levandusky*, 75 N.Y.2d at 541 n.*, 553 N.E.2d at 1323 n.*.  For

14   example, CUNA Mutual manager Rich Fischer testified that he did, in fact,

15   conduct a revised calculation with more appropriate numbers, but that any

16   earnout was nonetheless wiped out by other contractually permitted

17   deductions.  This testimony might provide one possible convincing

18   explanation for CUNA Mutual's behavior.  But because the defendant has

1    not produced any documentary evidence of a revised calculation, ***see id.,***

2    this justification hinges largely on the credibility of Fischer's testimony.[12]

3    Credibility determinations are inappropriate at the summary judgment

4    stage.  *See Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 146

5    (2d Cir. 2012).  This testimony is therefore not conclusive on appeal.

6        Alternatively, further proceedings may challenge the premise that

7    CUNA Mutual's high claim reserves from 2003 to 2005 were kept as a

8    result of a company-wide error.  We have relied, in this opinion, on

9    evidence in the summary judgment record that treats the high claim

10   reserves as erroneous and the resulting loss ratios as suspicious and

11   unreliable.  If the high reserves were kept as a result of a consciously risk-

12   averse business strategy, as the defendant appears to suggest, then the

13   numbers used to calculate the earnout may seem less dubious, and the

14   decision to use them in the calculation may not have been arbitrary.

15        We are required on this appeal to accept all factual inferences in the

16   plaintiff's favor, *Wachovia*, 661 F.3d at 171, and we therefore express no

---

[12] Fischer did give the same justification in an internal e-mail dated February 2007, but no calculations are included in that correspondence.  *See* E-mail from Rich A. Fischer to Gary E. Young (Feb. 22, 2007, 6:19 AM).

1   view on the ultimate consequences of adopting these alternative

2   characterizations of the facts.  We raise these issues only to illustrate the

3   possibility that the defendant's earnout calculation may, after further

4   proceedings, be characterized as a non-arbitrary exercise of business

5   judgment.[13]  Of course, it may not be.

6                              **CONCLUSION**

7                For the foregoing reasons, we conclude that the defendant was

8   entitled to summary judgment on the service fee claim, but that the record

9   presents a triable issue concerning the defendant's handling of the earnout

10  calculation.  On remand, the parties and the district court may wish to

11  determine whether, in light of our partial affirmance, the plaintiff's

12  remaining claim is capable of generating a positive damages award – an

13  issue that we cannot conclusively determine based on the record and

14  arguments before us – before proceeding to address the issue upon which

15  this remand is based.  The defendant also may wish to renew its motions,

16  rendered moot by the district court's earlier decision, to strike certain

---

[13]  We repeat that, for the reasons explained above, our remand is not an invitation for the plaintiff to renew its claims that CUNA Mutual violated the implied covenant by setting high claim reserves in the first place.

1   evidence from the summary judgment record.  The district court may then

2   determine – in light of this opinion, of course – whether the remaining

3   evidence creates a triable issue of fact on the plaintiff's claims invoking the

4   implied covenant of good faith and fair dealing.

5           Accordingly, the judgment of the district court is AFFIRMED in part

6   and VACATED in part.  The case is REMANDED for further proceedings.